# CITIZENS' BANK v. PARKER.

ERROR TO THE SUPREME COURT OF THE STATE OF LOUISIANA.

No. 2.   Argued  October 28,  1903.—Decided January 4, 1904.

When a contract is asserted and the Constitution of the United States invoked to protect it, all of the elements which are claimed to constitute it are open to examination and review by this court; and also all that which is claimed to have taken it away, and the writ of error will not be dismissed.

The rule requiring a strict construction of statutes exempting property from taxation should not be infringed but where ambiguity exists it is

the duty of the court to determine whether doubt exists and to solve it
and not to immediately surrender to it.

Where it is *res judicata* that the original charter of a bank by which its
capital is exempt from any tax constituted a contract within the impair-
ment clause of the Constitution, and that such exemption is not affected
by subsequent charters and constitutions, and there is no doubt that the
State intended to offer inducements to enlist capital in the early develop-
ment of the State, and no license· tax was demanded for fifty-eight years
although that method of taxation was in force during the whole period,
the exemption from any tax may be construed as including a license tax
on occupation as well as taxes on property.

THIS suit was instituted in the Civil District Court for the
Parish of Orleans for the recovery of the sum of twenty-four·
hundred dollars, claimed to be due from the bank for the year
1894 as a license tax for carrying on a banking business. The
license is claimed to have been authorized by the following
provision of Act No. 150 of the general assembly of Louisiana
of 1890: "That for each business of carrying on a bank, banking
company, association, corporation or agency, the license shall
be based on the declared or nominal capital and surplus,
whether said capital and surplus is owned or in· use, or on
deposit in the State or elsewhere, as follows, to wit: . . .
Ninth class. When the said declared or nominal capital and
surplus is four hundred thousand dollars or more, and under
six hundred thousand dollars, the license shall be four hun-
dred and fifty dollars ($450)."

The bank pleaded the general issue and that it was exempt
from paying such license by the provisions of its charter granted
in 1833, and by section 4 of the act of January 30, 1836,
amending the charter, by which it was provided that "the
capital of said bank shall be exempt from any tax laid by the
State, or by any parish or body politic, under the authority
of the State, during the continuance of its charter." It was
alleged that the charter of 1833 and the amendment of 1836
were granted for a valuable consideration, and constituted a
contract between the State and the bank, and that the act
imposing the license impaired the obligation of the contract,
and was therefore violative of the Constitution of the United

States. Certain judgments were also pleaded as *res judicata* and introduced in evidence, one of which was the decree of this court in *New Orleans* v. *Citizens' Bank,* 167 U. S. 371.

The trial court sustained the defence of the bank, based on its claim under its charter, but did not pass on the plea of *res judicata.* The court observed: "I pass only on the main issue raised without reference to the defendant's plea of *res judicata,* inasmuch as it does not appear that the issue of exemption from a license tax has been presented in any of the cases and judgments relied on to support the plea."

Judgment was entered, dismissing the demand of the State.. It was reversed on appeal to the Supreme Court, the court, however, dividing. 52 La. Ann. 1086. Elaborate opinions were delivered both by the majority and minority of the court. All of the contentions of the bank were held to be untenable, but the members of the majority did not agree upon the grounds. Mr. Justice Monroe, with whom concurred the Chief Justice, placed his decision on three grounds: (1) The plea of *res judicata* could not be sustained, because the validity of a license tax was not involved in the decrees or judgments pleaded. (2) License taxes were distinguishable from taxes on property, and the bank was not exempt from the former by its charter. (3) The act of 1874, extending the charter from 1884 to 1911, was to take effect in 1884, from which it was deduced: "First, that the extension thus granted could add nothing not authorized by the constitution of 1868, under the dominion of which the act was passed, and which required the payment of a license; second, that the grant, to take effect in 1884, became subject to the constitution adopted in 1879, which also required, or authorized the legislature to require, the payment of the license." (4) Even if this were not so, the acceptance by the bank of the Act No. 79 of 1880 "specifically and in terms subjected it to the constitution of 1879, and thereby placed it out of the power of the legislature to exempt it from the payment of the license imposed on other institutions of the same class."

Mr. Justice Watkins delivered a separate opinion, and placed his concurrence on the distinction between a license tax and a property tax, and said that "the conclusion is perfectly clear that a property tax was only in contemplation of the legislature in framing that exemption." And also said that the license law under which the State proceeded ". does not conflict with the contract clause of the Federal Constitution by impairing the contract rights of the defendant bank under its charter." Concluding his opinion, the learned justice observed:

"In my view, it is unnecessary for this court to go into any discussion of the constitutional questions raised and adverted to in the opinion of the majority, for the reason that on the face of the charter exemption, which the bank pleads, its liability is apparent.

"It is my view, also, that the better course of decision is, and one more in harmony with the general jurisprudence of this court, to avoid discussion of Federal questions which only arise incidentally and are unnecessary to the decision of the principal question at issue.

"Entertaining this view, I think it is preferable to pass the constitutional question under consideration and reverse the judgment of the District Court and sustain the license on the face of the charter and the law."

Mr. Justice Breaux and Mr. Justice Blanchard dissented, each filing an opinion.

*Mr. Henry Denis,* with whom *Mr. Branch K. Miller* was on the brief, for plaintiff in error.

*Mr. E. Howard McCaleb, Jr.,* with whom *Mr. E. Howard McCaleb* was on the brief, for defendant in error.

Mr. Justice McKenna, after stating the case, delivered the opinion of the court.

1. A motion is made to dismiss. The ground of it is that, even

if the charter of 1833 and the amendment of 1836 exempted the bank from license taxes, the bank, by accepting the act of 1880, which enabled the bank to make compromises with its mortgage creditors, became subject to the constitution of 1879, which, it is contended, authorized or required the legislature to impose a license tax. And besides the act of 1874 extending the charter was subject to the constitution of 1868, and that required the payment of a license. Upon those grounds Mr. Justice Monroe based his opinion, and they, it is urged, involved state questions sufficient to sustain the judgment. But those grounds only had the concurrence of the Chief Justice. Mr. Justice Watkins did not assent to them and Justices Breaux and Blanchard dissented from them. The judgment of the court, therefore, does not rest upon them. The judgment rests upon the construction of the original charter, that is, upon the contract between the State and the bank, but to construe that is also our function.

But assuming that the judgment rests upon the grounds stated, we, nevertheless, have the power of review. The Federal question presented is, did the bank at the time of the imposition of the license tax sued for have a contract with the State exempting it (the bank) from such tax? The elements of that question are the original contract and all subsequent legislation relating to the contract and which it is claimed modify or change it. The motion to dismiss is, therefore, denied.

2. The question presented on the merits has been simplified by the case of *New Orleans* v. *Citizens' Bank*, 167 U. S. 371. The origin and history of the bank are there detailed, its charter and its exemptions are construed, its litigations with the city are recited and their effect declared. We need only apply and extend the reasoning of that case to decide this.

It came here from the Circuit Court of the United States. It was brought in that court by a bill in equity to enjoin the taxing officers of the State and of the city of New Orleans from taxing the bank under certain provisions of a statute of the

State for the assessment of the capital of banks. Under the
statute the capital stock of banks which were represented by
shares were not assessed by that name, but the shares were
required to be assessed to the stockholders at their actual
valuation as shown by the books of the bank, and the taxes
assessed were required to be paid by the bank, which was given
the power to collect the amount from the shareholders or
their transferees. The real estate owned by the bank was
directed to be assessed directly to it and the tax "proportioned
to each share of capital stock" and deducted from the amount
of taxes of that share under the statute. The statute also
contained provisions for its administration and required prop-
erty which had been omitted from the assessment rolls to be
assessed for the current year and for three years back. The
court adjudged the bank to be exempt from the taxation and
granted an injunction against the collection of the taxes for
the designated years by the State of Louisiana, and the city
of New Orleans, "upon the capital, property or shares of stock
of the shareholders of said bank, whether assessed against the
bank or its shareholders."

The writ also enjoined the demanding or collecting from the
bank of any state or city license tax. Commenting on the
decree, this court said:

"The exemptions to which the decree below held the bank
to be entitled related therefore to distinct objects of taxation,
one not necessarily connected with or dependent upon the
other, and may be summarized as follows: First. That the bank
was not subject to taxation on its capital, shares of stock or
real estate and furniture actually used for the carrying on of its
banking business, and that the bank could not be lawfully
obliged to pay the sum of any tax assessed on its shareholders.
Second. That the stockholders of the bank were not liable for
assessment on their shares of stock. Third. That the bank
was also not subject to taxation on any real estate held by it
which had been mortgaged to secure stock subscriptions and
had become the property of the bank under foreclosure pro-

ceedings, because property so acquired became by virtue of the purchase a part of its capital stock. Fourth. That the non-liability of the bank to taxation embraced also immunity from the payment of a license to either the State of Louisiana or the city of New Orleans."

The decree was affirmed as to the objects of taxation embraced in the first subdivision, and reversed as to those embraced in the second, third and fourth subdivisions. Of the objects in the fourth subdivision it was said:

"We are at a loss to understand by what process of reasoning the decree was made to cover the question of the non-liability of the bank for license. It was not presented by the pleadings, and was entirely *dehors* the issue in the case."

In sustaining the decree of the Circuit Court as to the objects in the first subdivision, necessarily there was involved the decision that the charter of the bank, both as originally granted and as extended, exempted the capital of the bank from taxation, and the exemption was not taken away by the constitutions of 1868 and 1879, by the acceptance of the act of 1874 by the bank, nor by the act of 1880. Many considerations were referred to which might have justified this as an independent conclusion, but the decision was mainly rested upon the judgments of the courts of Louisiana which had been pleaded as *res judicata*, and which judgments, it was decided, had concluded the controversies. There was a clear adjudication, therefore, of the right of exemption of the bank from a tax on its capital.

The ruling in *New Orleans* v. *Citizens' Bank* has been followed by the Supreme Court of Louisiana. In *Treasurer of New Orleans* v. *Chaffraix*, 106 Louisiana, 250, 256, the same questions were raised on the statutes of 1874 and 1880 and the constitutions of 1868 and 1879, as are raised in the case at bar. The court, replying to them, said:

"Both these contentions were passed upon and negatived in *New Orleans* v. *Citizens' Bank*, 167 U. S. 371, and the effect of that decision of the Supreme Court of the United States is

to maintain and carry the exemption into the extended period of the bank's charter." ·

It is true that in a subsequent case, *State* v. *Sugar Refining Co.*, 108 Louisiana, 603, *Citizens' Bank* v. *New Orleans* is criticised and its views . re not concurred in as to what constitutes the thing adjudged and an estoppel in tax cases. But the thing claimed to have been adjudged was not a right claimed under the Constitution of the United States, and there was no intimation of disapproval of *New Orleans* v. *Chaffraix.*

But if it can be contended that there is conflict between the state cases, *New Orleans* v. *Citizens' Bank* is, nevertheless, decisive of the questions adjudged by it. *Deposit Bank* v. *Frankfort*, 191 U. S. 499. And all the questions in the case at bar were adjudged by it except the question of the exemption of the bank from the payment of license taxes. That question is now presented, and we think the exemption exists. We deduce this not only from the words of the charter, but from the purpose of its enactment and of its extension. The bank was made an agency of the State. To have fostered it with aid and to have burdened it with taxation of any kind would have been inconsistent, considering the provisions of the act incorporating it, and it was immaterial whether it was constituted a quasi public corporation or entirely a private one. It was created to accomplish purposes in which the State took an interest, and the expectations which were entertained of it may be regarded in the interpretation of its charter. With the wisdom or folly of the charter we have nothing to do. Our sole function is to interpret it. It may seem, in 1903, to have been imprudent legislation. But how did it appear in 1833 and 1836? We must contemplate it as of that time. States act through men, and, of course, cannot have a greater appreciation or prophecy of things than men. Events may disappoint or baffle their purposes, but they cannot for that reason be relieved from their obligations. Nor can they necessarily be accused of folly. There are limits to the power of government and the wisest provisions may be frustrated or turned to

detriment by causes which no prescience can foresee. It is, therefore, to 1833 and 1836 we must turn, to the conditions and purposes of then.

The chief industry of Louisiana was agriculture, and it seemed to the State a wise policy to encourage and expand that industry, and the means selected was a bank which could make loans to the planters upon the security of their lands. Capital was necessary. Private persons were to be induced to subscribe, and the State aided by an issue and pledge of its bonds. It was careful to make provision for control. No act of administration could be undertaken without its consent It was represented by six members on a board of twelve d.- rectors. It, besides, contemplated the probability of profits, and made provision to share them. The scheme was large and hazardous. Private capital had to be tempted to it, and the State, besides contributing its credit, offered the induce- ment of a relief from burdens. There is no doubt of this, and the dispute is only as to the degree, and, on an ambiguity which may be asserted upon a distinction in the form of taxation, a limitation is attempted to be put upon the comprehensive and expressive words of the bank's charter. This seems to us not justified. The words of the charter are "the capital of the bank shall be exempt from *any* tax." The word *any* excludes selection or distinction. It declares the exemption without limitation. And why should there have been limitation? What purpose was there to serve by making a distinction between the forms of taxation? The State did not intend to so limit its aid. It did not mean to help the bank to do business and then tax the business when done—relieve it and burden it at the same time; retain the right to impose as an occupation tax that which it gave up as a right to impose as a property tax.

This view is sustained by contemporaneous construction of the bank's charter. It was not only the immediate sense of the officers of the State, but their continued sense through a number of years, that the bank was exempt from all taxation,

and when the right of taxation was asserted a license tax was not included. And we have authority for saying that a license tax was not demanded during a period of fifty-eight years, notwithstanding the many changes in the administrative officers of the State; that during all that time, "even from and inclusive of the very first revenue act (that of 1813), adopted after the admission of the State into the Union, license taxation as a means of revenue was provided for and enforced," and for a portion of the time (from 1869) license taxes were imposed upon banks.

Stress is put in the argument at bar upon the distinction between taxes on property and taxes on occupations. The distinction exists and counsel have cited Louisiana decisions in which that distinction has been held to justify license taxes, notwithstanding clauses in charters exempting capital stock from taxation. A review of those cases is not necessary. They were all rendered subsequently to 1836, and they depended upon the application of the constitution of 1868 or 1879, or special circumstances not applicable to the charter of the Citizens' Bank. And those cases did not embarrass the court in defining the scope of the charter of the Citizens' Bank in the decisions presently to be considered.

That the distinction between property taxes and license taxes was recognized in Louisiana in 1833 or 1836 is not very clear; but subsequently the distinction was certainly not always considered as justifying a power to impose license taxes. In *City of New Orleans* v. *Southern Bank,* 11 La. Ann. 41, the general banking law of the State, approved April 30, 1853, called the Free Banking Law, was considered. The law provided "that bankers and banking companies, doing business under this act, shall be taxed upon their *capital stock* (italics ours) at the same rate as other personal property under the laws of the State." It was held that the provision was a contract with the individual corporations formed under the act, and a license tax imposed by the common council of the city under an act passed in 1842, Session Acts of 1842, p. 17, which

empowered the city to levy a license tax on certain enumerated occupations and "all other callings, professions or business," was illegal.

The same question was presented again in *State of Louisiana* v. *Southern Bank*, 23 La. Ann. 271, upon a license tax imposed by the revenue laws of 1869. The court was urged to overrule *New Orleans* v. *Southern Bank*. The court refused to do so and affirmed the doctrine of that case, and held the act "violative of section ten, article 1, of the Constitution of the United States." The Supreme Court of Louisiana, therefore, as early as 1853, construed a provision exempting the capital stock of a bank from taxation except at a particular rate as exempting the bank from a license tax. In other words, it was held that a license tax was virtually a tax on the capital of the banks, and, we think, that must be held of the tax in the case at bar. Whatever the tax may be called—one on property or one on occupations, if its final incidence is on the capital it is comprehended in the exemption contained in the charter. As we have already pointed out, the language of the charter is universal; and it was said in *Citizens' Bank* v. *Bouny, Tax Collector*, 32 La. Ann. 239, "That language is broad enough to cover everything which, during its existence, should enter into and make part of the capital of said bank." If the language is broad enough to preclude a tax upon that which may become part of the capital of the bank, it is broad enough to preclude a tax which may become a burden upon the capital. Whatever diminishes the income of a bank diminishes its capital under the provisions of the charter of 1833. It was said in the *Bouny* case: "By the twenty-ninth section of the original charter, 'all the profits made by said corporation shall be added to and made part of its capital,' except a certain fraction of any excess of profits over what was necessary to pay the bonds issued by the bank." And the sum of $159,238.62 accumulated profits were held not to be liable to taxation. And fully as significant was the exemption declared of the sum of $636,450 assessed to the shareholders of the bank as "value of capital

stock." It was said: "Even if the shareholders be liable to taxation on their shares (upon which we express no opinion), under the peculiar and exceptionable nature of the charter of the Citizens' Bank, we think it cannot be forced to pay taxes assessed to its shareholders." In other words, the burden of tax could not be put upon the bank, however it could be imposed upon the stockholders.

We may recur to *Treasurer of New Orleans v. Chaffraix.* It was a proceeding to recover the payment of a tax for the year 1899, imposed upon a certain number of shares of the capital stock of the Citizens' Bank held by Chaffraix. Exemption was asserted under the clause of the bank's charter which we have quoted. This was one of the questions left open by this court in *New Orleans v. Citizens' Bank,* and left open in the *Bouny* case. The exemption nevertheless was sustained. It was recognized that in some jurisdictions, "including the Supreme Court of the United States," it was held that the exemption of the capital of a corporation from taxation does not of necessity include the exemption of the shareholders on their shares of stock. But the court considered that it was not necessary to approve or disapprove the doctrine; and rejected it as inapplicable to shares in the Citizens' Bank, because the intent of the legislature was otherwise. And that intent was deduced "not only from the words of the charter," but from the purposes for which the bank was instituted, and they were vividly described. Because of them, it was in effect said, and of the bank's relation to them and the state's relation to the bank, the State "granted the clause quoted above exempting from taxation." And it was observed, "at that time the refined distinction between the capital and the capital stock of a corporation had not been made by the courts, or was at least unrecognized as yet in Louisiana." We see, therefore, that in the *Bouny* case it was held that a tax on that which might become capital, or a tax which the bank would have to pay, is illegal. In the *Chaffraix* case it is held that a tax which falls on the stockholders of the bank is illegal. In other words, the

effect of the two cases is that a tax which falls upon the capital or is to be paid by the bank or its stockholders, is prohibited. A license tax has surely some one of those effects.

It is urged, however, that neither the *Bouny* case nor the *Chaffraix* case can be adduced as authoritative. The argument is that a judgment in the case at bar has become the law of the case, and that it cannot be affected by what was or has been decided in some other case, and that the judgment in the case at bar rested on non-Federal grounds which were sufficient to sustain it, to wit, the construction and application· of the constitutions and statutes of that State. The.argument is the same as that directed against our jurisdiction, and has been.·answered. When a contract is asserted and the .Constitution of the United States invoked to protect it, all of the elements which are claimed to constitute it are open to our review;·and, also, all of that which is .claimed to have taken it away. We are certainly not confined to the decision under review. To hold that would surrender the power· of review. That decision, of course, claims our first, and a most thoughtful consideration, but in the right to challenge it is the right to go outside of it, and certainly nothing can afford more light or persuasion than the utterances of the same tribunal on prior and subsequent occasions.

These propositions then are established; the exemption granted to the bank in 1833 and 1836 was not taken away by the acts extending its charter and the application thereto of the constitutions of 1868 and 1879. This was the thing adjudged in *New Orleans* v. *Citizens' Bank, supra.*

The exemption of the charter includes a license tax. This, for the reason stated, must be regarded as part of the contract between the State and the bank. And· in reaching that conclusion the rule requiring a strict construction of statutes exempting property from taxation has not been infringed. We recognize the force and salutary character of the rule, but it must not be misunderstood. It is not a substitute for all other rules. It does not mean that whenever a controversy is or can

be raised of the meaning of a statute, ambiguity occurs, which immediately and inevitably determines the interpretation of the statute. The decisive simplicity of such effect is very striking. It conveniently removes all difficulties from judgment in many cases of controverted construction of laws. But we cannot concede such effect to the rule, nor is such effect necessary in order to make the rule useful and, at times, decisive. Its proper office is to help to solve ambiguities, not to compel an immediate surrender to them—to be an element in decision, and effective, maybe, when all other tests of meaning have been employed which experience has afforded, and which it is the duty of courts to consider when rights are claimed under a statute. Will courts ever be exempt, or have they ever been exempt from that duty? Has skill in the use of language over been so universal, or will it ever be so universal as to make indubitably clear the meaning of legislation? Has forecast of events ever been so sure, or will it ever be so sure, as to make inevitably certain all the objects contemplated by a statute? We think not, and there never will be a time in which judicial interpretation of laws will not be invoked, and it cannot be omitted, because a doubt may be asserted concerning the meaning of the legislators. We repeat, it is the judicial duty to ascertain if doubt exists.

*The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.*

Mr. Justice Brewer, with whom the Chief Justice concurs, dissenting:

I dissent from the opinion and judgment in this case and will state briefly my reasons therefor: Where it is contended that a State having once entered into a contract has by subsequent legislation impaired its obligations, this court, while exercising its independent judgment in respect to the terms of the contract and the fact of impairment, will lean to the views announced by the courts of that State. In *Wilson* v. *Standefer*, 184 U. S. 399, 412, we said:

"But as the general rule is that the interpretation put on a state constitution or laws by the Supreme Court of such State is binding upon this court, and as our right to review and revise decisions of the state courts in cases where the question is of an impairment by legislation of contract rights, is an exception, perhaps the sole exception, to the rule, it will be the duty of this court, even in such a case, to follow the decision of the state court when the question is one of doubt and uncertainty. Especial respect should be had to such decisions when the dispute arises out of general laws of a State, regulating its exercise of the taxing power, or relating to the State's disposition of its public lands. In such cases it is frequently necessary to recur to the history and situation of the country in order to ascertain the reason as well as the meaning of the laws, and knowledge of such particulars will most likely be found in the tribunals whose special function is to expound and interpret the state enactments."

Where it is contended that exemption from taxation has been granted by contract with the State, the exemption, if any be found to exist, will not be extended by construction; but will be confined to that which is clearly within the terms of the contract. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 544; *Ohio Insurance Co.* v. *Debolt*, 16 How. 416, 435; *Railroad Co.* v. *Litchfield*, 23 How. 66, 88; *Railway Co.* v. *Loftin*, 98 U. S. 559, 564; *Railroad Co.* v. *Thomas*, 132 U. S. 174, 185; *Railroad Co.* v. *Alsbrook*, 146 U. S. 279, 295; *Railroad Co.* v. *Decatur*, 147 U. S. 190; *Schurz* v. *Cook*, 148 U. S. 397, 409; *Bank* v. *Tennessee*, 161 U. S. 134, 146; *Insurance Co.* v. *Tennessee* 161 U. S. 174, 177.

In the last of these cases, on page 177, we said:

"It must always be borne in mind in construing language of this nature that the claim for exemption must be made out wholly beyond doubt; for, as stated by Mr. Justice Harlan, in *Chicago, Burlington & Kansas City Railroad* v. *Guffey*, 120 U. S. 569, 575: 'It is the settled doctrine of this court that an immunity from taxation by a State will not be recognized unless granted in terms too plain to be mistaken.'"

And in next to the last case we also said, on page 146:

"These cases show the principle upon which is founded the rule that a claim for exemption from taxation must be clearly made out.   Taxes being the sole means by which sovereignties can maintain their existence, any claim on the part of any one to be exempt from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded upon plain language.   There must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded.   It has been said that a well founded doubt is fatal to the claim; no implication will be indulged in for the purpose of construing the language used as giving the claim for exemption, where such claim is not founded upon the plain and clearly expressed intention of the taxing power.".

Only last term the same doctrine was reaffirmed in *Theological Seminary* v. *Illinois*, 188 U. S. 662, 672, in these words:

"The rule is that, in claims for exemption from taxation under legislative authority, the exemption must be plainly and unmistakably granted; it cannot exist by implication only; a doubt is fatal to the claim."

I make these quotations, which are in harmony with the many other decisions of this court, for even the most casual examination of them makes it apparent that the rule therein stated is plainly ignored in this case, and that a term, whose meaning is well understood, is stretched beyond its ordinary significance and to its utmost limits in order to include the alleged exemption.

The Supreme Court of Louisiana in this case held. that a license tax was not within the exemption of the bank from any tax upon its capital, the one being a charge for the privilege of carrying on the business, and the other an exemption of a part of the property of the bank from taxation.   In the course of its opinion it said, after referring to a prior case:

"There the tax resisted, like those resisted in the cases relied on, was, at least, a tax of the same character—that is, a tax

upon 'property'—while the tax involved in this litigation is one essentially different; it is a tax, it is true, but one upon callings or occupations, and it is controlled and governed by rules and principles entirely different from those which bear upon property taxation. *City of New Orleans* v. *Louisiana Savings Bank*, 31 La. Ann. 638; *Walters* v. *Duke*, 31 La. Ann. 671; *Parish of Morehouse* v. *Brigham*, 41 La. Ann. 665. Articles 203, 206, 207 and 209 of the constitution of 1879 also disclose this very fully and clearly. See *City* v. *Ernst*, 35 La. Ann. 746, and *State ex rel. Ernst* v. *Assessors*, 36 La. Ann. 347.

\*   \*   \*   \*   \*   \*   \*   \*

"The defendant urges that the license tax is substantially one upon its capital. The views expressed by us above indicate our opinion upon this point. The mere reference in the license acts to the declared or nominal capital or surplus from business or banking institutions is not a tax upon the capital or surplus itself of the different banks, but a mere method of classifying the banks and establishing a graduation of licenses as required by article 206 of the constitution. · *State of Louisiana* v. *Liverpool & London & Globe Insurance Co.*, 40 La. Ann. 463; *Parish of Morehouse* v. *Brigham*, 41 La. Ann. 665.

"This court, in *City of New Orleans* v. *State National Bank*, 34 La. Ann. 892, said: 'A provision in the charter of a corporation exempting its stock and real estate from taxation, does not cover an exemption *from license taxation*. The grant of a charter to a bank, authorizing it to carry on a certain business during the term of its charter, does not import permission to do so without contributing to the support of the government in like manner with natural persons pursuing the same business.'

\*   \*   \*   \*   \*   \*   \*   \*

"The extent of the exemption granted originally from taxation was from 'taxation upon its capital.' It could never have claimed greater or other exemption than that. The law of

1890, the unconstitutionality of which is pleaded, does not pretend to impose, nor does it impose any tax upon the '*bank's capital*,' and, therefore, there could by no possibility be, nor is there, any violation of any contract obligation through that act even should there really be any existing obligation at all between the State and the defendant as to taxation."

That there is a clear distinction between a property tax on the capital of a corporation and a license tax for the privilege of carrying on the business of the corporation, has been so often decided by this and other courts, and is so clear, that it seems almost a waste of words to refer to decisions. And yet it may be well to refer to a few that it may be apparent how strongly, emphatically and for how long a time the distinction has been affirmed. As a preliminary thereto let it be borne in mind that the franchise of a corporation is the privilege granted to it to do the business named in its charter, and a license tax for the privilege of doing business is simply a tax upon the franchise. In *Gordon* v. *Appeal Tax Court*, 3 How. 133, 150, decided in 1844, it was said:

"A franchise for banking is in every State of the Union recognized as property. The banking capital attached to the franchise is another property, owned in its parts by persons, corporate or natural, for which they are liable to be taxed, as they are for all other property, for the support of government."

In *Hamilton Co.* v. *Massachusetts*, 6 Wall. 632, 640:

"Property taxation and excise taxation, as authorized in the constitution of the State, are perfectly distinct."

In *Farrington* v. *Tennessee*, 95 U. S. 679, Mr. Justice Swayne, after referring to taxation of bank capital and shares of stock, added (p. 687):

"There are other objects in this connection liable to taxation. It may be well to advert to some of them.

" 1. The franchise to be a corporation and exercise its powers in the prosecution of its business."

In *Tennessee* v. *Whitworth*, 117 U. S. 129, 136, Chief Justice Waite declared:

"In corporations four elements of taxable value are sometimes found; 1, franchises; 2, capital stock in the hands of the corporation; 3, corporate property; and, 4, shares of the capital stock in the hands of the individual stockholders. Each of these is, under some circumstances, an appropriate subject of taxation; and it is no doubt within the power of a State, when not restrained by constitutional limitations, to assess taxes upon them in a way to subject the corporation or the stockholders to double taxation."

Both of these last cases were cited with approval in *Bank of Commerce v. Tennessee*, 161 U. S. 134, 146. Many more cases might be cited to the same effect, but these will serve as illustrations. It is conceded that this distinction was recognized in Louisiana, though it is contended that it was not always held sufficient to uphold, in the case of a contract exemption of the capital, the retention of a power to impose license taxes, and some early decisions of the Supreme Court of that State are cited. But what does this argument amount to? Because the distinction between the two taxes has not always been recognized in Louisiana it must now be repudiated. The legislature must be held to have not recognized the distinction in this case, because the courts have sometimes in other cases failed to recognize it. It is not pretended that there has been a uniform ruling on the part of the Supreme Court of Louisiana ignoring the distinction. On the contrary, this very case (and this is only one of several) recognizes it. It seems to me this is a plain overturning of the hitherto settled rule of this court, that a doubt is to be resolved in favor of a State, for the alleged doubt in this particular case is resolved in favor of the corporation.

But upon what ground is it claimed that a doubt exists? Why should not the legislature be credited with recognizing the distinction recognized elsewhere through the country and sometimes at least, if not always, in Louisiana? It is said that there is something peculiar in the organization of this bank; that its purpose was to aid the agricultural interests of the

State, and that the State assisted by a loan of its credit and retained partial control through directors appointed by it. But is it not the rule that an exemption from taxation is not given as a gratuity, but by reason of some supposed benefit to the State as a whole or some particular interest therein? Does the fact that some interest in the State is specially benefited change the rule as to the construction of an exemption? It seems to me that that is a doctrine as novel as it is dangerous. It is true that the State loaned its credit and retained a partial control through directors appointed by it, but we have in the legislation of Congress and in the decisions of this court a very suggestive analogy. The Union Pacific Railroad Company was a corporation chartered by Congress. It was given a large amount of public lands and the credit of the United States was loaned to it to the extent of $16,000 and over a mile. A partial control was retained through directors appointed by the government. In these respects it presents a close similarity to the Citizens' Bank. It was held by this court that while the franchise given by Congress to this and other transcontinental railroads was exempt from state taxation, yet the property belonging to those corporations was not. *California* v. *Pacific Railroad Company*, 127 U. S. 1; *Thomson* v. *Pacific Railroad*, 9 Wall. 579; *Railroad Company* v. *Peniston*, 18 Wall. 5. It was not doubted that Congress could in its discretion have provided for such exemption, but as it failed to prescribe it, the court held that it did not exist. If from the fact that the corporation was aided by bonds of the United States, was engaged in doing the work of the nation in interstate transportation and a partial control retained by Congress, that its property as well as its franchise was exempt from state taxation, why should there be an inference from the fact that Louisiana aided by its bonds this particular corporation and retained a partial control thereof; that it intended to grant any other exemption than was expressly stated?

Again, it is contended that contemporaneous construction determines that the exemption of the capital included the

192 U. S.    BREWER, J., and the CHIEF JUSTICE, dissenting.

exemption of the franchise.    It seems to me a sufficient answer is that in 1853 the Supreme Court held that a provision exempting the capital stock of a bank from taxation, except at a particular rate, exempted the bank from a license tax.    *City of New Orleans* v. *Southern Bank,* 11 La. Ann. 41.    It is not strange that thereafter there was no effort to impose a license tax on this bank and that the administrative officers respected the opinion of the Supreme Court, and did not until of late seek a reconsideration of that ruling.    It also appears that there was no specific statute providing for a license tax upon banks until 1869, and that was after the decision of the Supreme Court referred to.

It is also said that if a license tax on the franchise is enforced it must be paid out of the capital and so in effect be a tax upon the capital.    That argument would make in every case an exemption of the capital a relief from all taxation, for every tax must in the last analysis come out of the capital.    But what under those circumstances becomes of the doctrine of a strict construction of a contract exemption of taxes?

Further, it must be remembered that objects and means of taxation were not in the years past sought for with the same avidity as at present.    The demand for revenue was not so great, and there was much inattention to the matter of securing objects and devising modes of taxation.    So the mere fact that a particular kind of tax was not sought to be enforced upon any institution is not conclusive of the fact that it was necessarily exempt therefrom.    It may simply mean that other objects seemed to the taxing authorities more accessible and more conveniently reached for taxation.    At any rate, we are not justified in holding that the mere fact of an omission to press such a taxation upon the bank establishes that such a tax was included within the exemption in the face of a ruling of the highest court of the State that it was not.

For these reasons I am constrained to dissent from the opinion of the court.

MR. JUSTICE HARLAN also dissents.