**DISTRICT OF COLUMBIA OFFICE OF TAX & REVENUE,**
Petitioner,

v.

**BAE SYSTEMS ENTERPRISE SYSTEMS INC.,**
Respondent.

No. 10–AA–1071.

District of Columbia Court of Appeals.

Argued Sept. 19, 2012.

Decided Nov. 29, 2012.

Mary L. Wilson, Senior Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Andrew Van Brisker, Assistant Attorney General, were on the brief, for petitioner.

Robert L. Willmore, with whom Harold J. Heltzer, Washington, was on the brief, for respondent.

Before OBERLY, BECKWITH, and McLEESE, Associate Judges.

McLEESE, Associate Judge:

The District of Columbia Office of Tax and Revenue ("OTR") challenges a decision by the Office of Administrative Hear-

ings ("OAH") that BAE Systems Enterprise Systems, Inc. ("BAE") was exempt from the District of Columbia's corporate franchise tax in 2001 and 2002. In finding BAE exempt, OAH concluded that BAE had performed qualifying high-technology activities and had "maintain[ed] an office ... or base of operations in the District of Columbia" within the meaning of D.C.Code § 47–1817.01(5)(A)(i) (2001). OTR contends primarily that BAE did not maintain an office or base of operations in the District of Columbia. We affirm.

## I.

The "New E–Conomy Transformation Act," D.C. Law 13–256, D.C.Code § 47–1817.01 et seq. (2001), grants certain high-technology companies a temporary exemption from the District of Columbia's corporate franchise tax. To qualify, a company must have two or more employees and must derive at least 51% of its gross revenues from specified high-technology activities, including services involving the Internet or advanced computer software. D.C.Code § 47–1817.01(5)(A)(ii)–(iii). The company also must "maintain[ ] an office, headquarters, or base of operations in the District of Columbia." D.C.Code § 47–1817.01(5)(A)(i). The exemption is available for five years after the company "commences business," D.C.Code § 47–1817.06(a)(2)(C), in specific parts of the District of Columbia designated "High Technology Development Zones." 9 DCMR § 1199.1 (2012).

BAE is a Virginia-based private corporation that provides information-technology products and services, primarily to the federal government on the basis of large, long-term contracts. During 2001 and 2002, under contracts with terms ranging from one to seven years, BAE provided services to the federal government at three separate government facilities locat-

ed in the District of Columbia. It is undisputed that providing those services qualified as high-technology activity. See D.C.Code § 47–1817.01(5)(A)(iii). It is also undisputed that during 2001 and 2002 approximately 180 BAE employees were working in the District of Columbia while providing those services. Finally, it is undisputed that the places where BAE provided services to the federal government fell geographically within a designated "High Technology Development Zone[ ]." 9 DCMR § 1199.1.

The parties do contest whether BAE maintained an office or base of operations in the District of Columbia. The pertinent facts are undisputed. Revenue generated by work performed under the contracts totaled approximately $44 million in 2001. For 2001 and 2002, BAE reported total D.C. payroll of over $37 million. The contracts required BAE workers to provide services at the government's facilities. BAE employees assigned to the government facilities generally worked full-time, averaging forty hours per week, and typically reported to the same location on a daily basis for the duration of each contract. The government assigned specific work areas in its facilities for BAE employees. Within those designated areas, BAE selected desk and office workspaces for its own employees, and there were signs identifying BAE employees outside of their cubicles or offices. Except in rare circumstances, the employees working for BAE on the contracts did not have additional offices at other BAE locations, and BAE records reflected the addresses of the government facilities as its employees' official places of work.

BAE employees at the government facilities were permitted to work only on matters relating to BAE's contracts with the government. BAE employees could get access to the facilities only as authorized

by the government; access was generally restricted to weekday business hours. BAE used government-owned equipment in providing services under the contracts, and it did not own or lease real or tangible personal property in the District of Columbia during 2001 and 2002. For security reasons, BAE was precluded from making public its association with the government facilities. BAE was not identified in any building directory, telephone listing, or external sign, and BAE had no letterhead or business cards identifying its location at the facilities.

In its 2001 and 2002 tax returns, BAE claimed exemption from the District of Columbia franchise tax. OTR subsequently issued a notice of tax deficiency in the total amount of $534,764, taking the position that BAE was not exempt. BAE appealed the notice of deficiency to OAH, which ruled in favor of BAE. OAH concluded that BAE maintained a base of operations in the District of Columbia, because its employees "reported to work at daily locations" in the District of Columbia, to "conduct [BAE's] business of providing services to federal government agencies."

## II.

■ This court will uphold a ruling by OAH unless the ruling is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C.Code § 2–510(a)(3)(A) (2001). "The proper construction of a statute raises a question of law," *Washington v. District of Columbia Dep't of Pub. Works,* 954 A.2d 945, 948 (D.C.2008), and this court generally reviews legal conclusions *de novo. See Providence Hosp. v. District of Columbia Dep't of Emp't Servs.,* 855 A.2d 1108, 1111 (D.C.2004). Whether BAE maintained an office or base of operations in the District of Columbia is a mixed question of law and fact. In the administrative setting, "[w]e

review mixed questions of law and fact under our usual deferential standard of review for factual findings ... and apply *de novo* review to the ultimate legal conclusions based on those facts." *Hickey v. Bomers,* 28 A.3d 1119, 1123 (D.C.2011) (internal quotation marks omitted).

■ As previously noted, the pertinent facts are undisputed. Moreover, neither party suggests that OAH's legal determination in this case should be accorded deference. "Although we accord appropriate weight to the interpretation of a statute by the agency which is charged with its enforcement, and which therefore ordinarily has specialized expertise, ... OAH is vested with the responsibility for deciding administrative appeals involving a substantial number of different agencies." *Washington,* 954 A.2d at 948. Accordingly, OAH does not have "subject matter expertise" that would warrant deference to OAH's determination that BAE maintained an office or base of operations in the District of Columbia. *Id.*

■ This court does generally "owe a level of deference to OTR's interpretation of its governing statute." *School St. Assocs. Ltd. P'ship v. District of Columbia,* 764 A.2d 798, 805 (D.C.2001). The parties appear to agree that OTR's position in this case is entitled at a minimum to what is often called *"Skidmore"* deference—that is, such weight as is appropriate given "the thoroughness evident in [OTR's] consideration, the validity of [OTR's] reasoning, [the position's] consistency with earlier and later pronouncements, and all those factors which give [the position] power to persuade...." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See also, e.g., Mallof v. District of Columbia Bd. of Elections & Ethics,* 1 A.3d 383, 392–93 n. 41 (D.C.2010). OTR argues, however, that its position is entitled to more substantial deference.

In seeking substantial deference, OTR relies primarily upon an OTR regulation concerning the statutory language at issue. *See* 9 DCMR § 1199.1 ("Qualified High Technology Company-an individual or entity organized for profit that ... [m]aintains an office, headquarters, or base of operations in the District of Columbia...."). This court generally defers to an agency's interpretation of its own regulations unless that interpretation is "plainly erroneous or inconsistent with the regulations." *1330 Conn. Ave., Inc. v. District of Columbia Zoning Comm'n,* 669 A.2d 708, 714 (D.C.1995) (internal quotation marks omitted). Nevertheless, "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Gonzales v. Oregon,* 546 U.S. 243, 257, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). In this case, OTR's regulation regarding the tax exemption merely repeats the language of D.C.Code § 47–1817.01(5)(A)(i), and thus provides no concrete guidance about how to interpret the phrase "maintaining an office ... or base of operations." OTR's view about the proper interpretation of that statutory language is therefore not entitled to the strong deference generally accorded to an agency's interpretation of its own regulations. *See id.*

Even when agency regulations are not at issue, this court generally accords significant deference to an expert agency's interpretation of a statutory provision that the agency administers. *See, e.g., Washington Gas Light Co. v. Public Serv. Comm'n,* 982 A.2d 691, 710–11 (D.C.2009) (court will defer to agency interpretation that is "reasonable in light of the statutory language, the legislative history, and judicial precedent"). It is not entirely clear whether OTR claims entitlement to deference on this basis. For its part, BAE contends that OTR is not entitled to substantial deference in the circumstances of this case, because OTR's interpretation of the exemption (a) is a *post hoc* litigating position presented in pleadings in a case in which OTR is an interested party and (b) is inconsistent with positions taken by the District of Columbia in other analogous settings. We need not resolve the question whether OTR's position in this case would otherwise be entitled to substantial deference. Even where such deference is due, this court cannot uphold an agency interpretation that is unreasonable in light of statutory text, history, and purpose. *See School St. Assocs. Ltd. P'ship,* 764 A.2d at 805. For reasons that we now explain, OTR's position in this case cannot be sustained.

## III.

### A.

We look first to the meaning of the words "maintaining an office ... or base of operations," construed "according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc). Focusing on the word "maintain," OTR argues that only two of the dictionary definitions of that word make sense in the current setting: "to keep," especially in "a state of repair," and to "provide for/bear the expense of [or] support." *Webster's Third New International Dictionary, Unabridged* (2002). From that premise, OTR concludes that, as a matter of ordinary language, a company does not "maintain" an office or base of operations unless the company exercises "predominant dominion, control, or autonomy" over the office or base of operations.

OTR's proposed definition of "maintain" is unconvincing, for a number of reasons. First, other common definitions of "maintain"—such as "continue" or "keep in existence"—fit naturally in the current context. *See Thomas v. United States,* 588 A.2d 272, 275 n. 3 (D.C.1991) (in interpreting statute prohibiting "keeping" bawdy or disorderly house, court notes that "common definitions" of "maintain" include "continue" and "keep in existence") (citing *Black's Law Dictionary* 859 (5th ed.1979); *Webster's New World Dictionary* 884 (3d ed.1988)).[1] Second, OTR's conclusion does not follow logically from its premise. Even if the meaning of "maintain" were restricted to "keep in a state of repair" or "bear the expense of," neither of the latter concepts necessarily implies "dominion, control, or autonomy," much less "predominant dominion, control, or autonomy." For example, an outside company that was hired to maintain an office building in a state of repair might well have no dominion, control, or autonomy over any of the offices in the building. Similarly, a former spouse who was required by a divorce decree to pay to maintain a residence for the other spouse and the children of the marriage might have no rights at all with respect to the residence.

Shifting from language and logic to legal authority, we note that OTR has cited no precedent for interpreting "maintain" to impose a requirement of "predominant dominion, control, or autonomy." To the contrary, OTR's proposed definition of "maintain" conflicts with prior tax decisions in this jurisdiction. For example, the District of Columbia Tax Court held that a manufacturer "maintain[ed] a warehouse," and thus was subject to the District of Columbia's corporate franchise tax, where the manufacturer's goods were shipped into the District of Columbia and stored there, on the manufacturer's behalf, on property neither owned nor controlled by the manufacturer. *See American Brake Shoe Co. v. District of Columbia,* District of Columbia State Tax Reporter (CCH) ¶ 14–069 (1953). *Cf. also, e.g., North Lubec Mfg. & Canning Co. v. District of Columbia,* District of Columbia State Tax Reporter (CCH) ¶ 14–041 (1951) (manufacturer "ha[d] or maintain[ed]" warehouse, because it had "occupancy of space in [the] warehouse under contract"). There is out-of-jurisdiction authority to the same effect. *See West Publ'g Co. v. Superior Court,* 20 Cal.2d 720, 128 P.2d 777, 783 (1942) (legal publisher "maintain[ed] places of business" in law-firm libraries where publisher's employees were permitted to work and store books for sale).[2]

---

1. BAE relies primarily on the definition of "maintain" as "carry on." As OTR points out, it is awkward to speak of "carrying on" an office or base of operations. It is quite natural, however, to speak of keeping an office in existence. Thus, one might naturally ask whether a company planned to maintain an office or close it, and "maintain" in that context would mean nothing more than "continue to have."

2. *Moving outside the realm of taxation, the word "maintain" is often used without carrying any implication of "dominion, control, or autonomy."* For example, when courts and legislatures refer to a minor "maintaining" a place of residence, they presumably do not mean to suggest that the minor must have dominion or control over the residence. *See, e.g., McLaughlin v. Debord,* 14 So.3d 1222, 1223 n. 1 (Fla.Dist.Ct.App.2009) (discussing statute defining "custodial parent" as "parent with whom the child maintains his or her primary residence"). There are contexts, however, in which "maintain" has been analyzed in terms of "management" or "control." For example, this court has focused on "management" and "control" in interpreting criminal statutes prohibiting the keeping or maintaining of houses for various illegal purposes. *See Thomas,* 588 A.2d at 274–75; *Moore v. United States,* 927 A.2d 1040, 1052–53 (D.C. 2007). OTR does not rely on this line of cases, and appropriately so. First, these

We therefore are unpersuaded by OTR's arguments as to the natural understanding of the word "maintain" in the phrase "maintain[ ] an office ... or base of operations."[3] Nevertheless, that is not the end of the inquiry, because we must also consider the structure and legislative history of the franchise-tax exemption. Those considerations, however, also do not favor OTR's position.

## B.

■■■ "Whenever possible, a statute should be interpreted as a harmonious whole." *D.C. Appleseed Ctr. for Law & Justice, Inc. v. District of Columbia Dep't of Ins., Sec., & Banking,* 2012 WL 4006425, *18 (D.C. Sept. 13, 2012) (internal quotation marks omitted). OTR's interpretation of the franchise-tax exemption runs afoul of this principle. In OTR's view, a high-technology business is not exempt from the franchise tax simply because it is doing business in a high-technology zone: rather, the company must have predominant dominion, control, or autonomy over an office or base of operations. If that interpretation were correct, a significant incongruity would arise. Under D.C.Code § 47–1817.06(a)(2)(C), a company is entitled to the full exemption from the franchise tax "for five years after the ... company commences business in the high-technology zone." It would be strange, to say the least, if the time within which a company could claim the exemption started to run before the company was even eligible for the exemption. But that is what follows from OTR's interpretation, because companies might often "commence business" in a high-technology zone without having predominant control over an office or base of operations in the zone. In contrast, the provisions operate together far more sensibly if "maintain[ ] an office ... or base of operations" is read more broadly, as BAE reads it, to apply whenever a company is doing business through a substantial number of employees working at a fixed location in a high-technology zone.

## C.

Turning to the legislative history of the franchise-tax exemption, we find that legislative history to be ambiguous. Some of the legislative materials focus on job creation for District of Columbia residents. For example, the committee report emphasizes that "the District of Columbia currently accounts for only 13.8% of high-tech jobs in the region.... [T]he attraction and creation of new high technology-based businesses represents an important source for new jobs and public revenue for the District of Columbia." D.C. Council, Report on Bill 13–752 at 1 (Oct. 19, 2000). Similarly, Title II of the legislation specifically addresses work-force development. *Id.* at 10. This emphasis on job creation

cases do not explicitly hold that "management" or "control" is required to establish guilt, much less that "predominant" control or management would be required. Second, for the reasons explained in text, the specific provision at issue in this case cannot reasonably be read to require that BAE have management or control over the government facilities where its employees were working.

3. OTR's argument appears to stand or fall on its interpretation of "maintain." That is, OTR does not appear to contend that even if what BAE did amounted to "maintaining," the locations at which BAE employees worked nevertheless would not qualify as "offices" or "bases of operations" of BAE. In any event, BAE would naturally be understood to have a base of operations at any fixed location where a significant number of BAE's employees work. OTR does not appear to dispute that the locations of the government contracts at issue in this case would properly be viewed as the base of operations of the BAE employees working at those locations.

would seem to be consistent with making the franchise-tax exemption available to qualifying high-technology companies with a substantial work force in the District of Columbia.

On the other hand, the legislative history elsewhere focuses on the importance of inducing businesses to locate within the District of Columbia. For example, the legislation is generally described as consisting of "a series of tax incentives to encourage high technology companies to locate to the District of Columbia." *Id.* at 2. And Section 201, which provides a tax credit for companies who relocate job opportunities to the District of Columbia, is explained as "provid[ing] a tangible incentive which will spur relocation" and encourage more high-technology companies to "locate in the District." *Id.* at 5. The references to inducing companies to "locate" in the District of Columbia could be viewed as envisaging a stronger connection to the District of Columbia than was reflected in BAE's arrangements in this case.

These indications in the legislative history, however, are far from definitive in either direction. The Council of the District of Columbia might well have concluded, for example, that the way in which it wanted to attract jobs to the District of Columbia was to require companies to establish a physical presence in the District of Columbia of the kind that OTR contemplates. Conversely, the word "locate" is far from clear. For example, one might refer to a vendor as locating a business on the National Mall even if the vendor had no property interest or dominion or control over any particular spot on the Mall. Moreover, some of the other tax incentives in the legislation are directly targeted at induc-

ing companies to buy or lease real property to conduct their operations. *See, e.g.,* D.C.Code § 47–811.03 (2001). That being so, general references in the legislative history to the importance of inducing companies to "locate" in the District of Columbia do not necessarily establish that each of the tax incentives at issue would require such location.

**D.**

Although the legislative history of the franchise-tax exemption is inconclusive, the language and structure of the exemption lead us to conclude that OTR's proposed interpretation cannot reasonably be sustained. OTR emphasizes, however, that there is another factor to be considered: the doctrine that tax exemptions are construed strictly against the claiming party. *See National Med. Ass'n v. District of Columbia,* 611 A.2d 53, 55 (D.C.1992). The parties dispute the force of that doctrine, and it is true that the courts in this jurisdiction have described the doctrine in varying ways. *Compare, e.g., District Unemployment Comp. Bd. v. Security Storage Co.,* 365 A.2d 785, 790 (D.C.1976) ("An intention on the part of the legislature to grant an exemption from the taxing power of the state will never be implied from language which will admit of any other reasonable construction. Such an intention must be expressed in clear and unmistakable terms, or must appear by necessary implication from the language used...." ) (internal quotation marks omitted), *with, e.g., Waller v. United States,* 86 U.S.App.D.C. 93, 96, 180 F.2d 194, 197 (1950) ("Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced.") (internal quotation marks omitted).[4] This court has made

4. The Supreme Court also has described the doctrine in varying ways. BAE relies on *Citizens' Bank v. Parker,* 192 U.S. 73, 24 S.Ct.

181, 48 L.Ed. 346 (1904), for the proposition that the doctrine may not be automatically applied in all cases of ambiguity, especially if

clear, however, that the doctrine of strict construction of tax exemptions does not require adoption of an interpretation that is not reasonable in light of statutory language, structure, and history. *See, e.g., Sisters of Good Shepherd v. District of Columbia,* 746 A.2d 310, 315 (D.C.2000) (rejecting District of Columbia's interpretation of statute providing tax exemption: "We are persuaded that the District's interpretation is contrary to the legislative intent as reflected in the legislative history. For the same reason, we reject the District's argument that strict construction requires interpretation of the statute in the District's favor."); *cf. District of Columbia v. Orleans,* 132 U.S.App.D.C. 139, 140, 406 F.2d 957, 958 (1968) ("The precept of strict construction of tax exempt provisions has vitality for doubtful cases, but it may not be properly used to defeat the purpose of the legislature.").

For the reasons we have explained, OTR's narrow interpretation of the franchise-tax exemption is not reasonable in light of the exemption's language, structure, and history. The doctrine of strict construction of tax exemptions therefore does not require us to adopt OTR's interpretation. We note, moreover, that the tax exemption in this case is an unusual one. As its legislative history makes clear, the exemption was intended to be revenue-enhancing in the long term. *See, e.g.,* D.C. Council, Report on Bill 13–752 at 9 ("The Chief Financial Office[r] determined that

the legislation will have a mixed fiscal impact, costing the District money in the first two years and generating revenue in the years thereafter...."). This court has not considered how much weight to give the doctrine of strict construction of tax exemptions when the tax exemption at issue is intended to generate business activity that will ultimately enhance revenue. It would seem, however, that giving an unduly narrow reading to such a tax exemption could frustrate the legislature's purposes. *Cf., e.g., France Co. v. Evatt,* 143 Ohio St. 455, 55 N.E.2d 652, 653–54 (1944) (noting that although tax-exemption statutes are to be strictly construed, party was entitled to exemption because, *inter alia,* exemption's general purpose of producing multiplied tax revenues was served).

### E.

In sum, when all of the relevant considerations are taken into account, OTR's interpretation of the franchise-tax exemption cannot reasonably be sustained. To be eligible for an exemption from the franchise tax, a high-technology company need not exercise "predominant authority, dominion, or control" over an office or base of operations. Rather, it suffices if the company has a sufficient number of employees performing qualifying high-technology work at a fixed location in a high-technology zone for a sufficiently extended period of time.[5] OAH therefore correctly

doing so would defeat the purpose of the statute being interpreted. *See id.* at 85–86, 24 S.Ct. 181 ("[The doctrine] does not mean that whenever a controversy is or can be raised of the meaning of a statute, ambiguity occurs, which immediately and inevitably determines the interpretation of the statute."). *Cf. Helvering v. Bliss,* 293 U.S. 144, 150–51, 55 S.Ct. 17, 79 L.Ed. 246 (1934) (refusing to give narrow construction to tax exemption for income devoted to charity, because exemption was "begotten from motives of public poli-

cy"). Other Supreme Court cases express the doctrine in much more forceful terms. *See, e.g., Phoenix Fire & Marine Ins. Co. v. Tennessee,* 161 U.S. 174, 177, 16 S.Ct. 471, 40 L.Ed. 660 (1896) ("It must always be borne in mind in construing language of this nature that the claim for exemption must be made out wholly beyond doubt...."). On questions of statutory construction such as this, we are guided primarily by our own cases.

5. In this case, BAE's employees were working at fixed locations under contracts ranging

determined that BAE was eligible for the franchise-tax exemption.

## IV.

OTR asserts for the first time in this court that even if BAE were otherwise eligible for a franchise-tax exemption, BAE could seek only a reduced tax rate, rather than a full exemption, because BAE had already been conducting business in a high-technology zone for more than five years before the statute creating the exemption was enacted. *See* D.C.Code § 47–1817.06(a)(2)(C). In general, arguments not made before the administrative agency may not be raised for the first time on review in this court. *See, e.g., Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 33 (D.C. 1992). In exceptional circumstances and in order to avoid "manifest injustice," however, this court has discretion to consider contentions not properly presented to the agency. *See, e.g., Sawyer Prop. Mgmt., Inc. v. District of Columbia Rental Hous. Comm'n*, 877 A.2d 96, 105 (D.C.2005).

Although OTR argues that exceptional circumstances warrant our review, we conclude to the contrary, and therefore decline to consider the issue OTR belatedly seeks to raise. First, it is far from clear that OTR would be entitled to prevail on the merits of its argument, because the statutory language and legislative history are equivocal at best concerning OTR's contention that the period within which companies could claim the exemption began to elapse before the exemption was enacted. Second, our case law contradicts OTR's claim that the potential loss of tax revenue by itself establishes exceptional circumstances warranting consideration of a belatedly raised claim. *See, e.g., District*

of *Columbia v. Califano*, 647 A.2d 761, 765 (D.C.1994) (exceptional circumstances did not warrant consideration of District of Columbia's belated challenge to tax credit provided to taxpayers). Third, the issue OTR seeks to raise seems to be a transitional one: whether the franchise-tax exemption should be interpreted to apply to companies already doing business at the time of the exemption's enactment. Given that the exemption was enacted in 2001, there is little reason to suppose that resolution of this issue would be of general significance in future cases.

## V.

The order of OAH is therefore

*Affirmed.*

---

from one year to seven years in duration. Those circumstances suffice to fulfill any requirements of continuity and duration that

might be thought implicit in the word "maintain."