**Arthur THOMAS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 89–1287.**

District of Columbia Court of Appeals.

Submitted Feb. 21, 1991.

Decided March 28, 1991.

---

David W. Windley, Washington, D.C., appointed by the court, was on the brief, for appellant.

Jay B. Stephens, U.S. Atty., John R. Fisher, Steven W. Pelak and Douglas K. Klein, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN and WAGNER, Associate Judges, and PRYOR, Senior Judge.

FERREN, Associate Judge:

A jury found appellant guilty of "keeping a bawdy or disorderly house," D.C. Code § 22–2722 (1989). The trial court sentenced him to one year of imprisonment but suspended execution of the sentence contingent on completion of one year's supervised probation, performance of 100 hours of community service, and payment of a $110 fine. Appellant contends: (1) the trial court erred in allowing into evidence "other crimes" testimony indicating that appellant had been managing the apartment as a bordello on occasions other than the day he was arrested, and (2) there was insufficient evidence to prove that appellant "maintained" the premises. We affirm.

I.

Noticing a large number of suspected prostitutes going in and out of a second floor apartment at 1345 S Street, N.W., police officers staked out the premises between July 16 and 18, 1989. Officer Sovonick testified that between 10:40 p.m. on July 16 and 12:10 a.m. on July 17 he observed twelve couples enter the apartment, stay there for approximately twenty minutes, and then leave. Around midnight that same night, Sovonick drove three-quarters of a block away and noticed a woman he had seen entering and leaving the apartment earlier that evening; she was standing on the corner "beckoning passing cars."

Officers Shieder and Bryson were in another observation post on July 18 between 11:00 and 11:45 p.m. They observed five to six couples enter the apartment, stay five to fifteen minutes, and then leave. Around 11:17 p.m., they saw appellant leave the apartment behind a couple who had entered at 11:05 p.m. As appellant stood outside the apartment, another couple pulled up in a car, walked up to appellant, and accompanied him inside the apartment. At 11:45 p.m., appellant came out with a different couple and, when the couple left, began to direct traffic outside the apartment.

Accompanied by a female prostitute who was working as an informant (her name does not appear of record), Officer Abdalla entered the apartment around 11:20 the same evening. At the top of the stairs, appellant told the prostitute which room she could use. The prostitute told Abdalla to pay appellant $10.00, which he did. The prostitute asked appellant if he had condoms or beer for sale. Appellant replied that he did not have condoms but that someone had gone to buy beer. Appellant directed Abdalla and the woman to a room. The prostitute told Abdalla that if they were in the room for more than ten minutes, they would be kicked out. They left the room after seven minutes and, after observing appellant once again, left the apartment.

On July 28, after obtaining arrest and search warrants, Officers Sovonick and Kamperin went to the apartment and found appellant standing about fifteen to twenty feet away from the front door. They arrested him. As the officers entered the apartment, they saw a couple coming out of a room. The woman was buttoning her dress. Two other women were sitting in the apartment. A search of the apartment revealed two adjacent rooms, each with two mattresses on the floor separated by a hanging sheet. The kitchen also had a mattress on the floor and a tub filled with beer. Also discovered in the apartment were numerous used and new condoms, business cards with "Party Time Shangrila" printed on them, and money. There

was also a sign specifying prohibited uses of the trash can and lavatory signed "Thank you, Manager." Officer Johnson, a government expert witness, testified that this evidence indicated the apartment was being run as a house of prostitution, commonly called a "trick pad."

## II.

Appellant claims the trial court erred in allowing testimony and exhibits concerning the stakeout of July 16–17, 1989, and the results of the search on July 28, 1989. He contends this evidence is inadmissible "other crimes" evidence because he was charged with running a disorderly house only on July 18th. *See Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964). Appellant is mistaken. To support a conviction under D.C.Code § 22–2722 for keeping a bawdy or disorderly house, the government must prove that the premises are regularly used for the commission of illegal or immoral acts. *See Harris v. United States,* 315 A.2d 569, 575 (D.C.1974) (en banc); *Killeen v. United States,* 224 A.2d 302, 304 (D.C. 1966); Criminal Jury Instructions for the District of Columbia, No. 4.95(2) (3d ed. 1978).[1] Thus, evidence from July 16–17 and 28, as well as from July 18, was relevant to show the required regularity of unlawful conduct. *See Ali v. United States,* 581 A.2d 368, 376–77 (D.C.1990); *Toliver v. United States,* 468 A.2d 958, 960–61 (D.C.1983). *Drew* evidence is evidence of *another* crime independent of the crime charged. *Jones v. United States,* 477 A.2d 231, 237 (D.C.1984). The evidence from July 16–17 and 28 was not admitted as evidence of another, independent crime. Thus, it was not even arguably admitted for the improper purpose of proving appellant's bad character or disposition to commit crimes. *See Wheeler v. United States,*

470 A.2d 761, 769 (D.C.1983); *Willcher v. United States,* 408 A.2d 67, 75 (D.C.1975). Accordingly, the trial court committed no error in admitting this evidence.

## III.

Although the statute forbids "keeping" a bawdy or disorderly house, D.C.Code § 22–2722, the standard jury instructions states, see *supra* note 1—and the trial court instructed the jury in this case—that the first element of the offense was "maintain[ing]" the premises in question. Appellant claims there was insufficient evidence to support his conviction for "maintaining" a disorderly house. We must view the evidence in the light most favorable to the government. *See Beatty v. United States,* 544 A.2d 699, 701 (D.C.1988). We may reverse only if there is no evidence from which a reasonable jury could find guilt beyond a reasonable doubt. *See Shelton v. United States,* 505 A.2d 767, 769 (D.C. 1986).

Appellant argues that "maintaining" is synonymous with a legal right to the premises. It would follow that, absent proof appellant owned[2] or had legal control of the premises, he could not be found guilty as a matter of law. The trial court noted, in discussion with counsel, that the standard instructions did not define "maintain." The court therefore supplied its own definition, instructing the jury as follows:

> You may find that the defendant maintained the premises in question if you find that the defendant admitted persons to the premises, assigned those persons rooms in the premises, and accepted payments from those persons for the use of the assigned rooms for the purpose of prostitution.

---

**1.** Criminal Jury Instructions for the District of Columbia, No. 4.95 (3d ed.1978), states the elements of the offense:
(1) That defendant maintained the premises in question;
(2) That persons commonly resorted to such premises for immoral purposes; and
(3) That the defendant knew, or should have known, that the premises were so used.

**2.** Mr. Grover, the owner of the premises, testified for appellant. He testified that he had never seen appellant before trial and that appellant was not the person who rented the apartment. According to Grover, he rented the apartment to a man who paid him $1,000 cash in June 1989 and another $1,000 in July.

The trial court's instruction was not erroneous. To prove a defendant has "maintained" or "kept" a disorderly house, the government does not have to prove ownership or legal control of the premises. The government only needs to establish that appellant in fact controlled or managed the premises.[3] *See State v. Weston,* 235 Iowa 148, 150, 15 N.W.2d 922, 923 (1944) ("[O]wnership of the house is not a necessary element of [keeping a disorderly house], nor is it necessary that the keeper be a lessee or tenant, actual possession or control being sufficient to constitute him such. A keeper is one who controls or manages the premises."); *Curley v. State,* 215 Md. 382, 387, 137 A.2d 640, 644 (1958) (keeping and maintaining disorderly house "does not respect ownership or proprietorship, but the conduct of the place").

 Appellant notes our use of the word "proprietor" in *Harris* and accordingly suggests that, despite other definitions in other jurisdictions, ownership of a disorderly house is required for conviction under § 22–2722. In *Harris* we noted that, "to constitute the offense of keeping a bawdy or disorderly house ... the government must prove ... the proprietor knows or should know of the acts and does nothing to prevent them." 315 A.2d at 575. That language must be read in context: defendant-appellant admitted to owning and running a homosexual health club. *Id.* at 570. The question whether § 22–2722 required ownership, therefore, was not before the court. We characterized the defendant as a "proprietor" simply because that was, in effect, how he described himself, not because conviction required a legal interest in the premises. *Harris,* therefore, stands merely for the proposition that the government must prove a defendant knew or should have known of the acts alleged—the third element of the offense. *See supra* note 1.

There is ample evidence of record here to support a finding that appellant knew the premises where he operated was a house of prostitution. Indeed, there was ample evidence, see *supra* Part I, from which a reasonable juror could find, based on the trial court's proper instruction, that appellant's conduct reflected all the elements of "maintaining" or "keeping" a bawdy or disorderly house.

*Affirmed.*

---

3. Our interpretation comports with COMMON DEFINITIONS OF MAINTAIN: "[To] continue; furnish means for subsistence or existence of; hold; ... hold or preserve in any particular state or condition; keep from change; keep from falling, declining, or ceasing; keep in existence or continuance ... supply with means of support...." BLACK'S LAW DICTIONARY 859 (5th ed.1979); "[To] keep up; continue in or with; carry on; keep in existence or continuance...." WEBSTER'S NEW WORLD DICTIONARY 884 (3d ed.1988).